## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 21-cr-00279-1 |
| PATRICK D. THOMPSON | Judge Franklin U. Valderrama |

## MEMORANDUM OPINION AND ORDER

After phone calls in which he stated, among other things, that he "borrowed $110,000," as well as five filed tax returns in which he claimed he paid mortgage interest when he had not, Patrick D. Thompson (Thompson) was indicted, and ultimately convicted, on two counts of making a false statement with the intent to influence the Federal Deposit Insurance Corporation (the FDIC) and a mortgage lending business, in violation of 18 U.S.C. § 1014, and five counts of filing a false tax return, in violation of 26 U.S.C. § 7206(1). R. 1, Indictment; R. 141, Verdict.[1] Thompson now moves the Court for a judgment of acquittal on all seven counts, or, in the alternative, a new trial. R. 154, Mot. Post-Trial. For the reasons stated below, the Court denies Thompson's motion.[2]

---

[1]Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation. The Court refers to the trial transcripts for the entire trial (R. 142–150) collectively as "Tr."

[2]After the Government rested at trial, Thompson moved for judgment of acquittal on Counts I and II, which the Court denied without prejudice. R. 124; Tr. 1167:22–1168:20; R. 128.

**Background**

On April 29, 2021, a special grand jury indicted Thompson in connection with money he had received from Washington Federal Bank for Savings (Washington Federal). R. 1, Indictment. In Count I, he was charged with violating 18 U.S.C. § 1014 by falsely stating to mortgage lending business, Planet Home Lending (PHL), on February 23, 2018, that "he only owed $100,000 or $110,000 to Washington Federal and that any higher amount was incorrect, when defendant then knew he had received $219,000 from Washington Federal." Indictment at 3. In Count II, he was charged with violating 18 U.S.C. § 1014 by falsely stating to the FDIC that "he only owed $110,000 to Washington Federal, that any higher amount was incorrect, and that these funds were for home improvement, when defendant then knew he had received $219,000 from Washington Federal and the $110,000 was paid to a law firm as defendant's capital contribution." *Id.* at 4. In Counts III through VII, Thompson was charged with violating 26 U.S.C. § 7206(1) by filing false tax returns for tax years 2013 through 2017, as a result of his claiming that he had paid mortgage interest when he had not and reporting a taxable income lower than his actual taxable income. *Id.* at 5–10. At trial, the Government and Thompson presented evidence, which the Court summarizes here as it is relevant to Thompson's post-trial motion.

## I. Washington Federal Transactions

Alecia Mandujano (Mandujano), a loan servicer at Washington Federal, testified at trial that between 2011 and 2014, John Gembara (Gembara), the President of Washington Federal, gave her instructions to print out three checks

made out to and/or picked up by Thompson. Tr. 444:21–25, 446:23–447:3, 450:18–455:7, 461:15–463:25, 465:8–467:16.

The Government presented evidence showing that the first check in the amount of $110,000, dated November 15, 2011, was payable to the law firm of Burke, Warren, MacKay & Serritella, P.C. (Burke Warren). Tr. 450:18–451:9; GX 92.[3] Jeffrey Warren (Warren), the chairman of Burke Warren, testified that when Thompson first joined the firm in 2011 as a shareholder, he was required to make a monetary contribution to the firm. Tr. 794:5–16, 795:7–25. Burke Warren's general ledger indicates a payment of $110,000 that was made for Thompson's capital payment, and corresponds to the first check Mandujano printed for Thompson on November 15, 2011. Tr. 796:11–20, 797:7–798:1; GX 92, GX 169.

Mandujano testified that Gembara provided her with a promissory note dated November 15, 2011, indicating the borrower was Thompson and stating that Thompson promised to pay a principal amount of $110,000 plus interest to Washington Federal. Tr. 454:21–456:6; GX 89. Mandujano entered the $110,000 loan as a mortgage loan into Washington Federal's computer system, so a Form 1098 was generated at the end of the year. Tr. 479:21–18. Gabriel Fakhouri, a manager of recording operations in the Cook County Clerk's Office, testified that recorded mortgages are records that his office regularly keeps. Tr. 520:15–521:3, 522:6–8. He conducted a search for documents recorded by Washington Federal related to two properties in Chicago, 3536 South Lowe (Thompson's primary residence) and 3544

---

[3]The Court refers to the parties' exhibits as follows: GX for the Government's exhibits and DX for Thompson's exhibits.

South Lowe (Thompson's rental property), and did not see any recordings for Washington Federal. Tr. 523:7–524:25.

Mandujano testified that she created a second check made payable to Thompson, dated March 22, 2013, in the amount of $20,000. Tr. 461:3–462:4; GX 94. She created a third check for Thompson made payable to North Community Bank, dated January 24, 2014, in the amount of $89,000. Tr. 465:8–466:10; GX 96. According to Mandujano, Thompson picked up both checks from Washington Federal. Tr. 463:3–25, 466:17–467:10.

Mandujano further testified that Thompson made one interest payment to Washington Federal related to the first loan, a check in the amount of $389.58, dated February 19, 2012, and signed by Thompson. Tr. 459:21–460:24; GX 163. According to Jacob Evans (Evans), a special agent with the FDIC Office of Inspector General, Thompson did not make any payments to Washington Federal after 2012. Tr. 818:7–19, 987:15–17.

## II. Tax Returns

Timothy Quinn (Quinn), a certified financial planner worked at Bansley and Kiener, testified that the firm mailed its clients a questionnaire known as a 1040 tax organizer, which had a series of questions for them to answer so the firm could use the answers in preparing their tax returns. Tr. 339:25–340:15, 343:11–344:22. Thompson was a client of Bansley and Kiener. Tr. 341:18–20, 344:16–22. The tax organizer also included a series of pages that would list out the prior year's income, expenses, and deductions that a client had taken to serve as a "memory jogger." Tr.

4

343:24–344:3. The firm's clients would return their completed organizers and all the tax documentation necessary to prepare a tax return to the firm. Tr. 344:10–13, 531:1–532:12. Quinn assisted in preparing Thompson's 2013 and 2014 tax returns, while Robert Hannigan (Hannigan), a managing partner with Bansley and Kiener, has prepared the tax returns for Thompson and his wife since 2015. Tr. 360:13–25; 373:11–13,528:15–18, 529:24–530:1.

Quinn and Hannigan testified that, in each of the charged tax years, Thompson filled out the tax organizers and returned them with various documents. Tr. 348:5–17, 412:9–11, 567:17–568:5, 584:17–584:18, 599:12–600:3. They testified that, for tax years 2013 through 2016, Thompson included Mortgage Interest Statements (Form 1098s) for Washington Federal in the documents he provided with the tax organizers. Tr. 361:7–362:10, 373:25–374:2, 567:17–568:5, 583:17–584:18. In the tax organizers themselves for those years, Thompson did not write anything in the line regarding a Form 1098 for Washington Federal. Tr. 410:3–21, 411:12–412:11, 665:15–22, 677:24–678:2. Based on the Form 1098s, Quinn and Hannigan included mortgage interest deductions on the prepared tax returns for tax years 2013–2016. Tr. 361:4–363:15, 373:14–374:2, 575:13–577:22, 585:9–586:5; GX 1 at 6; GX 2 at 9, 58; GX 34 at 10, 57; GX 38 at 8, 49. No Form 1098 was included in the documents Thompson sent to Hannigan with the 2017 tax organizer. Tr. 603:4–7, 635:7–14. Hannigan nevertheless included a $10,000 mortgage interest deduction on the 2017 tax return. Tr. 635:7–14.

Quinn and Hannigan testified that they communicated with Thompson when preparing his tax returns. *See* Tr. 342:20–343:2, 602:20–603:7; 631:8–632:7. Quinn

testified that Thompson never told him that he was not making payments to Washington Federal nor that the loan at Washington Federal was not a mortgage. Tr. 374:3–15.

Quinn testified that in 2013 and 2014, once Thompson's tax returns were completed, they were sent to Thompson to file. Tr. 359:12–20, 375:16–23. Once Thompson received the tax returns for 2015, 2016, and 2017 for his review, he submitted an electronic authorization form (Form 8879) each year that allowed Bansley and Kiener to electronically file his tax returns. *See* Tr. 572:1–8, 574:10–12, 586:6–16; GX 34; GX 39; GX 44; GX 86.

### III. February 2018 Phone Call

David Ohlrich, who works for the FDIC, testified that PHL was a contractor the FDIC used with respect to Washington Federal, and that PHL serviced loans on behalf of the FDIC. Tr. 780: 11–12, 788:9–16, 791:1–3. Evans, a special agent with the FDIC Office of Inspector General, testified that, in a letter dated January 10, 2018, the FDIC informed Thompson and his wife that the servicing of the loan from Washington Federal was transferring from the FDIC to PHL, effective January 26, 2018. Tr. 818:7–19, 914:1–16; GX 184. A statement from PHL addressed to Thompson and his wife, dated February 16, 2018, shows a loan principal balance amount of $269,120.58 and that $2,049.14 is due by March 1, 2018. Tr. 917:4–21; GX 72.

Thompson called PHL on February 23, 2018, and spoke with William Murray (Murray), a customer service representative for PHL. Tr. 118–19, 180:3–5. According to Murray, Thompson asked for help in figuring out the balance of his loan. Tr.

1180:14–16. On an audio recording of the phone call, which was played for the jury, Thompson stated, "I borrowed $100,000," which he later corrected to $110,000. GX 188; GX 189[4] at 3:13, 7:8–10; Tr. 934:25–935:15. During the call, Thompson stated:

> I have no idea, the numbers that you've sent me shows that I have a loan for $269,000 dollars. I[] borrowed $100,000 dollars, and it actually never was able to close the loan. I[] was trying – to []close this loan. I signed a Promissory Note. I have no – for $100,000 dollars in . . . 2011, umm and – I've been trying to – Mr. Gembara, who is deceased now, who was assuring me we would be closing all the paperwork and documentation and . . . handle the closing for the last seven years. And I have all kinds of e-mails, and I – I have no idea where the 269 number comes from. And so I don't know if it's you guys now that I need to . . . talk to and walk through, but I have no idea what paperwork you have, and I'd like to see it cause this doesn't match with anything that I have."

GX 188; GX 189 at 3:11–4:1. Thompson went on to state, "I mean, I borrowed the money, I owe the money – but I borrowed . . . I think it was $110,000 dollars." GX 188; GX 189 at 7:8–10. Later in the call, when referencing a letter he received from PHL, Thompson stated that the letter listed the "historical loan number, unpaid principal and balance, and transfer is 269,120.58" and went on to tell Murray, "And I dispute that, I – I – that's and I never – . . . ." GX 188; GX 189 at 12:4–7. Murray created a task for further research, informing Thompson that he would have someone research it. GX 188; GX 189 at 12:24–13:2; Tr. 1180:8–12. Murray noted after the call that Thompson was disputing the principal balance and "believed that he borrowed $110,000." Tr. 1184:4–14; DX 76.

---

[4]The transcript of the call was shown to the jury during trial while the audio recording was played, but was not admitted into evidence. Tr. 934:1–22. For clarity in this Opinion, the Court cites to both the audio recording, R. 188, and the transcript, R. 189.

## IV. March 2018 Phone Calls

William Holly (Holly), a project manager for MMC Group, a company which provided the FDIC with assistance on closings, worked on trying to identify Washington Federal assets after Washington Federal failed. Tr. 998:19–999:4, 1000:7–10, 1000:22–25. Holly called Thompson on March 1, 2018. Tr. 1008:18–24. Dan Newell (Newell), Holly's colleague, was with Holly when he made the call. Tr. 1008:22–1009:2. The beginning of the conversation was about the note or debt to the organization affiliated with Thompson, the 11th Ward. Tr. 1010:6–9. Then, Holly and Newell asked Thompson about his personal loan. Tr. 1010:13–1011:1. Holly and Newell both testified that, during the call, they told Thompson that the loan was for $269,000. Tr. 1011:12–17, 1079:1–15. But, Holly later testified he did not know whether this amount was mentioned to Thompson. Tr. 1048:11–14. Holly further stated: "You couldn't sense that he was, you know, surprised or anything. But, obviously, he didn't realize – I don't think he realized it was that much." Tr. 1011:24–24. Newell further stated that Thompson disputed it. Tr. 1079:6–8. Both Holly and Newell testified that Thompson said the loan was for $110,000. Tr. 1011:25–1012:2, 1078:11–13.

On a communications log that contained notes about Holly's calls with borrowers, an entry corresponding to March 1, 2018 states: "Mr. Thompson spoke about his personal debt 110,000. John Gembara loaned him 110,000 for home improvement, which was to be rolled up into his home loan (Bank was to do a term loan). . . . He is disputing his balance and is sending us the documentation for this

also." Tr. 1009:3–8, 1013:18–1014:1; GX 191 at 1–2. Holly testified that this conversation was about amounts Thompson borrowed. Tr. 1033:12–18. He also confirmed that Thompson did not say he only owed $110,000 and that any higher amount was incorrect. Tr. 1034:16–18. Holly further testified that he did not recall Thompson saying he "only borrowed $110,000" or that "I only owe $110,000 and no other amount." Tr. 1052:10–13. Newell further testified that Thompson did not know what he owed and that he did not dispute the $110,000. Tr. 1091:23–1092:5.

Holly also testified that the communications log is the best evidence of what was said during calls. Tr. 1024:8–10. Although Holly initially denied that Thompson told him during this call that the purpose of the loan was a law firm contribution, he also admitted that the only time he talked to Thompson about the purpose of his personal loan was on March 1, 2018. Tr. 1035:25–1036:18, 1041:7–13. Newell testified that Thompson told him during the March 1, 2018 call that the loan's purpose was for home improvement. Tr. 1078:22–25. But Newell later testified that that the only time he recollected talking to Thompson about the loan's purpose was on March 1, 2018. Tr. 1099:18–21. In April 2018, Newell wrote to Thompson and told him that the $110,000 distribution "was confirmed by you as your buy in to the firm." GX 199; Tr. 1095:2–1096:17.

## V. December 2018 Agent Visit and Call to Hannigan

At 8:15 a.m. on December 3, 2018, Evans and Special Agent Jason Gibson (Gibson), with IRS Criminal Investigation, visited Thompson at his house unannounced to interview him. Tr. 935:16–936:4, 944:12–19. Evans testified that,

during the interview, they discussed Thompson's loan at Washington Federal, Evans and Gibson asked him questions about the loan, and Thompson provided information about the loan. Tr. 938:16–25. Specifically, Evans told Thompson that he was investigating Washington Federal, but he never told Thompson that Thompson himself was the subject of an investigation or that Thompson's taxes or tax deductions were the subject of an investigation. Tr. 950:23–951:8. At some point during or at the end of the interview, Gibson served Thompson with a grand jury subpoena that called for Thompson to appear and provide records, including but not limited to federal tax records and records used to prepare federal tax returns, loan and credit applications, records related to the purchase of Thompson's primary residence, his rental residence, and a third property located in Michigan. Tr. 939:1–22, 941:9–942:6, 948:19–22; GX 411.

Hannigan testified that Thompson called him on December 7, 2018, during which call Thompson told Hannigan that a new bank wanted to see a release of the Washington Federal mortgage, and, at that time, he told Hannigan it was not a mortgage loan but an unsecured line of credit. Tr. 730:5–12. Hannigan testified that they discussed amending Thompson's tax returns on the call. Tr. 637:20–669:1.

## Legal Standards

### I.    Rule 29

Under Rule 29(c), a defendant may move for a judgment of acquittal after a guilty verdict, and "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(2). Rule 29(a) further

instructs that, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).

A defendant seeking acquittal, however, faces "a nearly insurmountable hurdle." *United States v. Garcia*, 919 F.3d 489, 496 (7th Cir. 2019) (internal quotation and citation omitted). The height of the hurdle "depends directly on the strength of the government's evidence." *United States v. Kelerchian*, 937 F.3d 895, 907 (7th Cir. 2019) (internal quotation and citation omitted). A court, moreover, reviews the evidence at trial "in the light most favorable to the government and draw[s] all reasonable inferences in its favor." *United States v. Hidalgo-Sanchez*, 29 F.4th 915, 924 (7th Cir. 2022) (internal quotation and citation omitted). Accordingly, a court only overturns a conviction if, after reviewing the record in a light most favorable to the Government, it concludes "that no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Id.* (internal quotation and citation omitted). A verdict must stand if the record offers a reasonable basis for it. *Id.* (internal quotation and citation omitted). In addition, a court defers to the jury's deliberations and respects "the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences." *United States v. Godinez*, 7 F.4th 628, 638–39 (7th Cir. 2021) (internal quotation and citations omitted).

If a court enters a judgment of acquittal after a guilty verdict, Rule 29(d) requires the court to "conditionally determine whether any motion for a new trial

should be granted if the judgment of acquittal is later vacated or reversed." Fed. R. Crim. P. 29(d)(1).

## II.     Rule 33

Rule 33 permits a court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A new trial is warranted "only if there is a reasonable possibility that the trial error had a prejudicial effect on the jury's verdict." *United States v. Maclin*, 915 F.3d 440, 444 (7th Cir. 2019) (internal quotation and citation omitted). "[T]he crucial factor is the degree and pervasiveness of the prejudicial influence possibly resulting from the jury's exposure to the extraneous material." *Id.* (internal quotation and citation omitted).

### Analysis

Thompson moves the Court to enter a judgment of acquittal pursuant to Rule 29(c), or in the alternative, for a new trial pursuant to Rules 33 and 29(d). The Court considers Thompson's acquittal arguments first, and then turns to his arguments for a new trial.

## I.     Motion for Judgment of Acquittal

Thompson advances two primary bases for acquittal. First, he argues that for Counts I and II, the Government failed to prove each element of the charges beyond a reasonable doubt, and that no rational jury could have found Thompson to be guilty based on the evidence. Mot. Post-Trial at 2–12. Second, Thompson argues that for Counts III through VII, no rational jury could have found that Thompson acted willfully with respect to his tax returns and therefore could not have found him guilty

12

beyond a reasonable doubt. *Id.* at 13–15. The Court reviews each basis for acquittal in turn.

### A. Counts I and II

The jury found Thompson guilty on two counts of making a false statement with the intent to influence the FDIC or a financial institution, in violation of 18 U.S.C. § 1014 (Counts I and II).

Section 1014 "criminalizes 'knowingly mak[ing] any false statement or report . . . for the purpose of influencing in any way the action' of a [Federal Deposit Insurance Corporation (FDIC)] insured bank 'upon any application, advance, . . . commitment, or loan.'" *United States v. Wells*, 519 U.S. 482, 490 (1997) (quoting 18 U.S.C. § 1014). The elements for a Section 1014 charge are: (i) that the defendant made a charged false statement to the FDIC or financial institution; (ii) at the time the defendant made the statement, he knew it was false; and (iii) the defendant made the statement with the intent to influence the FDIC or financial institution in collecting money owed. *See United States v. Lane*, 323 F.3d 568, 580 (7th Cir. 2003) (internal quotation and citation omitted); *see also* R. 153-1, Jury Instructions at 18, 22. Thompson contests each element.

### 1. Whether Charged Statements Were Made and Can Support Thompson's Conviction

In Count I, Thompson was convicted for falsely stating that "he owed $100,000 or $110,00 to Washington Federal and that any higher amount was incorrect[.]" Indictment at 3; R. 141, Verdict. In Count II, Thompson was convicted for falsely stating: (1) that "he only owed $110,000 to Washington Federal and that any higher

13

amount was incorrect," and (2) "that these funds were for home improvement[.]" Indictment at 4; R. 141, Verdict.

Thompson contends that the Government did not prove the first element of Section 1014 beyond a reasonable doubt because the Government did not prove that Thompson made the charged false statements listed above. Mot. Post-Trial at 3.

### a. Statements About the Loan Amount Owed (Counts I and II)

As to the statement charged in Count I (that Thompson falsely stated to PHL that "he only owed $100,000 or $110,000 to Washington Federal and that any higher amount was incorrect, when defendant then knew he had received $219,000 from Washington Federal"), Thompson argues that the evidence supports only that Thompson told Murray that he "borrowed" $110,000, not that he "owed" only $110,000. Mot. Post-Trial at 3. Thompson also notes that he did not say that he did not owe (or borrow) "any higher amount" than $110,000, but rather, the evidence shows only that he disputed borrowing $269,000. *Id.* at 3–4. Similarly, as to the first statement charged in Count II (that Thompson falsely stated to the FDIC that "he only owed $110,000 to Washington Federal and that any higher amount was incorrect . . . when defendant then knew had received $219,000 from Washington Federal"), Thompson argues that the evidence shows that Thompson told Holly and Newell that he *borrowed* $110,000, not that he *owed* $110,000. *Id.* at 4. Thompson points out that Holly explicitly contradicted the charge in the indictment, testifying that Thompson "did not say he only owed $110,000 and that any higher amount was incorrect." *Id.*

14

at 4 (citing Tr. 1034). Relatedly, Thompson emphasizes that Newell agreed that Thompson never said he *only* owed $110,000. *Id.* at 4–5 (citing Tr. 1088–1089).

Based on the evidence introduced supporting his statements as to the amount of the loan, Thompson argues that (1) there was a constructive amendment (or variance) to the indictment, and (2) he did not make a false statement for purposes of Section 1014, because his statements were literally true. The Court starts with Thompson's constructive amendment and variance arguments.

### i. Constructive Amendment and Variance

Thompson contends that his conviction on Counts I and II should be vacated because the Government's trial evidence constructively amended the indictment with respect to the charged statements regarding the amount owed. Mot. Post-Trial at 5–7.

The Fifth Amendment provides in part that, "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury . . . ." U.S. Const. amend V. The United States Supreme Court has "explained 'that a court cannot permit a defendant to be tried on charges that are not made in the indictment against him.'" *United States v. Heon Seok Lee*, 937 F.3d 797, 805–06 (7th Cir. 2019) (quoting *Stirone v. United States*, 361 U.S. 212, 217 (1960)). The Seventh Circuit has observed that "[t]wo related doctrines arise out of this Fifth Amendment requirement: constructive amendment and variance." *Id.* "A constructive amendment of an indictment occurs if jury instructions support a conviction for a crime other than that charged." *United States v. Burge*, 711 F.3d 803,

811 (7th Cir. 2013) (internal citation omitted). On the other hand, a variance "does not alter the essential substance of the charged offense." *Id.* (internal quotation and citation omitted). "Not every minor variance [between an indictment and jury instructions] constitutes a constructive amendment." *Id.* at 814.

Thompson maintains that the indictment was constructively amended because the jury was allowed to conflate what he actually said (that he borrowed $110,000) and what was charged (that he "only owed" $110,000 and "that any higher amount is incorrect"). Mot. Post-Trial at 5. As a result, Thompson argues that his Fifth Amendment rights were violated because the possible bases for conviction were broadened beyond those presented by the grand jury, and therefore the verdict must be vacated. *Id.* (citing *United States v. Willoughby*, 27 F.3d 263, 266 (7th Cir. 1994) (constructive amendment is reversible *per se*)).

The Government responds that Thompson waived or forfeited[5] any constructive amendment or variance argument at trial, because "Defendant did not object to the admission of any portion of the statements defendant made on February 23 and March 1, and did not raise any argument about a possible constructive amendment until after the government indicated it would rest." Resp. at 9 (citing *United States v. Remsza*, 77 F.3d 1039, 1041 (7th Cir. 1996)). Thompson argues in

---

[5] "Waiver" is the "the intentional relinquishment of a known right," whereas and "forfeiture" is "the failure to 'make the timely assertion of a right.'" *United States v. Remsza*, 77 F.3d 1039, 1043 n.3 (7th Cir. 1996) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). The Government argues that Thompson "waived, or at least forfeited, his claim that the government's evidence created a constructive amendment." Resp. at 9. Because the Court finds that Thompson neither waived nor forfeited the argument, it addresses the two together.

reply that the Government's waiver argument is misplaced. *See* R. 160, Reply at 9. The Court agrees with Thompson and finds *Remsza* distinguishable.

In *Remsza*, the defendant was charged with falsely representing to a firearms dealer that he was purchasing guns for his own use when he was in fact purchasing guns for others. 77 F.3d at 1041–42. At trial, the defendant admitted on cross-examination that he also lied to the firearms dealer about his drug use, the government introduced "other acts" evidence that the defendant also purchased a gun for another third-party from the same dealer, and the trial court instructed the jury that the defendant made "a false statement" to the dealer while buying guns. *Id*. 1041–43. At trial, the defendant "made no objection to [the other acts] testimony, the drug use cross-examination . . . or the jury instruction," and did not raise an argument about constructive amendment until he filed a post-trial motion for judgment of acquittal or for a new trial. *Id*. at 1043. The court therefore found that the defendant had forfeited any constructive amendment claims. *Id*. Here, unlike the defendant in *Remsza*, Thompson did not fail to object to a jury instruction instructing the jury as to a charge that did not match the indictment and could have encompassed evidence that did not match the charge from the indictment. *Id*.; Reply at 9. And importantly, Thompson raised his constructive amendment argument during trial when the Government indicated it would rest, and also filed a motion as to constructive amendment; he did not wait until the filing of his post-trial motion. Tr. 1151:7–

1153:11; R. 124. The Court therefore finds that Thompson did not waive a constructive amendment argument.[6]

The Government posits that, even if Thompson did not waive the constructive amendment argument, it nonetheless fails on the merits. The Court agrees. As the Government correctly states, constructive amendments based on evidence occur when the evidence involves "a complex set of facts distinctly different from" the ones alleged in the indictment. *Heon Seok Lee*, 937 F.3d at 806 (quotation omitted). As discussed above, the indictment in relevant part charged Thompson with falsely stating to PHL (Count I) and to the FDIC (Count II) that "he only owed $100,000 or $110,000 to Washington Federal and that any higher amount was incorrect." R. 1. The Court instructed the jury by reading the specific language of the false statements alleged in the indictment. Tr. 1323:10–12 (the indictment "charges that the defendant falsely told Planet Home Lending that he only owed 100,000 or 110,000 to Washington Federal and that any higher amount was incorrect"); Tr. 1325:5–7 ("The first false statement charged is the defendant stated that he only owed 110,000 to Washington Federal and that any higher amount was incorrect."). Thompson does not argue that these instructions were incorrect, but rather that the evidence at trial proved only that he borrowed $110,000 and disputed a higher balance. Mot. Post-Trial at 5. The Government is correct that constructive amendment concerns are mitigated when the jury is instructed that, in order to convict, it must find that the

---

[6]Because the Court finds that Thompson did not waive the argument, if the Court were to agree with Thompson that the indictment was constructively amended, it would be error *per se* and the verdict would have to be vacated; the Court would only apply a "plain error" standard if Thompson had forfeited the argument. *See Heon Seok Lee*, 937 F.3d at 806 & n.4.

defendant made the statements as alleged in the indictment—as the jury was instructed here. Resp. at 10 (citing *United States v. Mitchell*, 64 F.3d 1105, 1112 (7th Cir. 1995) (no constructive amendment when jury was instructed that it had to find defendant possessed the drug "charged [in the indictment] at the time and place alleged"); *Heon Seok Lee*, 937 F.3d at 808 n.5.

Neither party cites to any in-Circuit authority with a similar set of facts. But the Court finds the case cited by the Government, *United States v. Ongaga*, 820 F.3d 152, 163 (5th Cir. 2016), and the primary case cited therein, instructive. The court in *Ongaga* found that "in [] context . . . the false statement alleged [defendants entered into a "bona fide marriage"] and the false statement proven [that defendants entered into a marriage in accordance with the laws] were synonymous." *Id.* True, as Thompson points out, "bona fide" means "in accordance with the laws," Reply at 10 (citing *Ongaga*, 820 F.3d at 164), so it is of limited use to support the Government's argument. However, in reaching its holding, the *Ongaga* court looked to *United States v. Jara–Favela*, in which "the indictment charged the defendant with lying to federal officers when he told one officer that he was traveling from Laredo, Texas, and told the other officer that he was traveling from Nuevo Laredo, Mexico [and t]he evidence at trial, however, showed instead that he told one officer he was coming from the 'north' and another he was coming from the 'south.'" *Ongaga*, 820 F.3d at 163 (citing *Jara-Favela*, 686 F.3d 289, 300 (5th Cir. 2012)). *Ongaga* observed that, in *Jara-Favela*, it "found no constructive amendment because, in context, the terms were synonymous." *Id.*

19

As the Government argues, in the context of conversations that Thompson initiated with PHL and the FDIC, both of which centered on the amount of money the entities were allowed to collect from Thompson, he stated that he borrowed $110,000, rather than stating that he borrowed the higher $219,000 amount. Resp. at 8. As noted above, in both conversations, he disputed the higher amount. According to the audio recording, Thompson told Murray of PHL that he had "no idea where the 269 number [came] from," admitting that he "owe[d] the money" but that he borrowed $110,000." GX 188, GX 189 at 3:11, 7:8–10. Although there is some conflicting testimony about Thompson's conversations with Holly and Newell of the FDIC, evidence was presented to the jury that he told them that the loan was for $110,000 and disputed that it was for $269,000. Tr. 1011:25–1012:2, 1078:11–13, 1079:6–8. The Court finds that here, in context, the evidence presented did not establish offenses "different from or in addition to those charged by the grand jury." *United States v. Khilchenko*, 324 F.3d 917, 920 (7th Cir. 2003).

To the extent Thompson argues that the evidence at trial amounted to a variance from the indictment, Mot. Post-Trial at 17, the Court agrees with the Government that any such variance was immaterial, Resp. at 11. As previously noted, variance "refers to situations where the government's trial evidence proves facts materially different from those alleged in the indictment." *Heon Seok Lee*, 937 F.3d at 806 (internal quotation and citation omitted). Variance claims are reviewed under the harmless error standard, and a variance is fatal only if it deprives the defendant of an opportunity to prepare a defense or exposes the defendant to a risk of being

prosecuted twice for the same offense. *Id.* at 807 (internal citations omitted); *see also United States v. Ratliff-White*, 493 F.3d 812, 820 (7th Cir. 2007). Neither of those concerns is present here. Thompson was able to prepare for and present a defense. As the Government points out, Thompson had a copy of the recorded conversation with PHL and of the FDIC's communications log related to the charged statements, and was able to use those items in preparing for and at trial. Resp. at 11; *see Ratliff-White*, 493 F.3d at 822 (no prejudice where exhibits were produced to defendant before trial and defendant could prepare to cross-examine key witness). Similarly, no risk of double jeopardy exists. The indictment specifically identifies the statements made, as well as provides additional information concerning circumstances related to the loan, which forecloses the possibility of a second prosecution. *Heon Seok Lee*, 937 F.3d at 807 ("The indictment also included specific details about the scheme alleged, alleviating any double jeopardy concerns.").

*United States v. Sorich*, 523 F.3d 702, 716–17 (7th Cir. 2008), cited by the Government, is instructive. In *Sorich*, the court found that no material variance existed between the indictment charge that the defendant falsely stated he "had never heard" of a group getting preferential treatment, with evidence that the defendant said "he didn't have any knowledge" about that group getting preferential treatment. *Id.* The Court disagrees with Thompson that such statements "convey exactly the same substance." Reply at 10. True, in context, "never heard of" and "didn't have any knowledge of" have the same meaning, but there are situations where they could convey different things. So too with "borrow" and "owe." The Court

21

does not find Thompson's statements that he "borrowed" $110,000 and disputed a higher amount—when examined in context—were materially different than the charges in the indictment that he "owed" $110,000 and no higher amount. This leads to Thompson's literal falsity argument, which the Court addresses next.

### ii. Literal Falsity

Thompson next argues that the Government did not meet the first element of Section 1014 (the making of a false statement) for Counts I and II because "[a] conviction for false statements cannot be sustained where, as here, the alleged statements are literally true, even if misleading." Mot. Post-Trial at 7. In other words, Thompson argues that a conviction under 18 U.S.C. § 1014 requires evidence of literal falsity.[7] Thompson reasons that because the only evidence produced at trial was of statements Thompson made that were literally true—that he borrowed $110,000 and disputed borrowing $269,000—said statements cannot sustain a conviction under Section 1014. Mot Post-Trial at 10–11. In support, Thompson cites numerous cases, none of which persuade the Court that literal falsity is required for a Section 1014 charge in the Seventh Circuit.

Thompson initially directs the Court to *Bronston v. United States*, 409 U.S. 352 (1973) for the proposition that "courts have consistently held that statutes criminalizing false statements cannot be extended to criminalize false implications." Mot Post-Trial at 7. However, the Court finds *Bronston* unavailing, as the *Bronston*

---

[7]Before the close of trial, Thompson proposed a jury instruction on "Literally True Statements." *See* R. 127 at 10. However, Thompson withdrew the proposed instruction after the final jury instruction conference. *See* R. 135 at 2.

decision was focused on a situation specific to the federal perjury statute, not Section 1014. The Supreme Court granted certiorari in *Bronston* "to consider a narrow but important question in the application of the federal perjury statute, 18 U.S.C. s 1621: whether a witness may be convicted of perjury for an answer, under oath, that is literally true but not responsive to the question asked and arguably misleading by negative implication." 409 U.S. at 352–53. While the Supreme Court ultimately held that a witness could not be convicted of perjury for such a literally true but non-responsive answer, *id.* at 362, the Court based that holding, in large part, on the questioner's role. That is, the Court found that in the situation of a "wily witness" who "speaks the literal truth" in a misleading way, the "burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry." *Id.* at 360 (citations omitted). The Court further concluded that while the petitioner's answers could have been "shrewdly calculated to evade . . . any special problems arising from the literally true but unresponsive answer are to be remedied through the 'questioner's acuity' and not by a federal perjury prosecution." *Id.* at 362. Because this is a Section 1014 case, not a perjury case, and because there is no questioner equivalent here, Thompson's citation to *Bronston* does not convince the Court that evidence of literal falsity was required for his conviction.

The next case cited by Thompson, *Williams v. United States*, 458 U.S. 279 (1982), likewise fails to support his position. *See* Mot Post-Trial at 8. While *Williams* is a Section 1014 case, the Supreme Court there addressed whether the act of check

kiting,[8] constituted a violation of 18 U.S.C. § 1014. The Court held that check kiting did not violate Section 1014 because "technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false.'" 458 U.S. at 284. And, in the absence of legislative history indicating that Section 1014 was designed to prevent bad checks, the Court declined to construe Section 1014 as proscribing check kiting. *Id.* at 287. Here, no one disputes that evidence of an assertion or statement was necessary to convict Thompson, so *Williams* does not advance Thompson's argument.

In terms of Seventh Circuit authority, Thompson highlights *United States v. Krilich*, 159 F.3d 1020, 1029 (7th Cir. 1998). Mot Post-Trial at 8. According to Thompson, in *Krilich* "the Seventh Circuit expressly applied the literal falsity test in upholding the defendant's conviction under Section 1014[.]" *Id.* Before diving into *Krilich*, the Court observes that the Government, surprisingly, did not address *Krilich* in its response brief. *See* Resp.[9] As a result, the Government has waived any argument on the case. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010).

[8]Check kiting is "the illegal practice of writing a check against a bank account with insufficient funds to cover the check, in the hope that the funds from a previously deposited check will reach the account before the bank debits the amount of the outstanding check." CHECK-KITING, Black's Law Dictionary (11th ed. 2019); *see also Williams*, 458 U.S. at 281 n.1.

[9]Instead, the Government points to *United States v. Swanquist*, 161 F.3d 1064 (7th Cir. 1998), *see* Resp. at 6, a case of limited usefulness to the literal falsity question. The Government is correct that the court in *Swanquist* affirmed a defendant's Section 1014 convictions, in part, because the defendant failed to list all of his debts in applying for loans, "thereby concealing and under-reporting certain debts in order that he might receive or renew loans from numerous financial institutions." 161 F.3d at 1070. However, the defendant in that case did not argue that his statements were literally true; he contended that "he believed his answers to be truthful based upon his own understanding about which categories of debts were

In *Krilich*, the defendant bribed a mayor to extract tax-exempt funds from municipal bond offerings, which funds the defendant kept in a trust, as they were only supposed to be released to reimburse expenses for an apartment complex the defendant was building. 159 F.3d at 1024. But the defendant preferred to use the funds for other things, such as yacht payments, so he "instructed vendors to falsify their invoices and had those bogus invoices sent to the banks for payment out of the trust accounts." *Id.* The defendant was convicted of various crimes, including fraud under Section 1014. *Id.* On appeal, the defendant argued that Section 1014 did not apply to his conduct because Section 1014 "applies only to statements made to obtain loans or other extensions of credit; because the withdrawals of the trust funds were not lending transactions, the statute was not violated." *Id.* at 1028. The court rejected the defendant's argument, reading the text of Section 1014 as "straightforward and broad," and as applying "to 'any' statement made for the purpose of influencing in 'any' way the action of 'any' of the covered institutions in 'any' application." *Id.* (citation omitted). Because the defendant "caused vendors to make false statements in applications presented to federally insured banks," Section 1014 applied to the defendant, regardless of the fact that the statements pertained to bond proceeds held in trust by banks, rather than loan and credit applications. *Id.*

The court in *Krilich* additionally rejected the defendant's argument, based on *Williams*, 458 U.S. 279, that Section 1014 did not apply to his conduct. 159 F.3d at

---

required to be disclosed in the documents." *Id.* at 1071. The *Swanquist* decision therefore focused on the defendant's belief that his answers were true and did not address the literal falsity issue currently before this Court.

1029. The Seventh Circuit stated, "*Williams* posed the question whether a no-funds check is a 'false statement' for the purposes of § 1014; the Court concluded that the only 'statement' made by a check is an instruction to the drawee bank to pay, and that the implication that funds are available for that purpose is not covered by § 1014 because a misleading implication differs from a false statement." *Id.* (citing *Bronston*, 409 U.S. 352). The Seventh Circuit found that *Williams* did not support the defendant's position because the defendant "induced vendors to make literally false statements." *Id.* The court further stated that to rule in the defendant's favor, the court would have to depart from the Supreme Court's holding in *United States v. Wells*, 519 U.S. 482 (1997), in which the Supreme Court "reminded [the Circuits] not to add elements to § 1014." 159 F.3d at 1028–29.

Thompson argues that *Krilich* is controlling authority making it "crystal clear that a charge under 18 U.S.C. § 1014 cannot be sustained by a misleading statement" and that "literal falsity is required." Reply at 1. The Court disagrees. As the Seventh Circuit stated in *Krilich*, the statements that the defendant induced in that case were literally false, so the court was not tasked with deciding whether a literally true statement could support a Section 1014 conviction. 159 F.3d at 1029. The court in *Krilich*, therefore, did not grapple with whether a literally true statement falls under the purview of Section 1014. The Seventh Circuit certainly did not categorically hold that a Section 1014 conviction requires a literally false statement. At most, the *Krilich* court rejected the defendant's *Williams*-based attempt to read Section 1014 narrowly. Therefore, the Court does not read *Krilich* as the Seventh Circuit holding

26

that a Section 1014 conviction requires a literally false statement. To the Court's knowledge, the Seventh Circuit has not issued a decision engaging in a detailed analysis of the issue.

The Sixth Circuit, by contrast, squarely and thoroughly addressed literal falsity in the Section 1014 context in *United States v. Kurlemann*, 736 F.3d 439, 448 (6th Cir. 2013), another case cited by Thompson. *See* Mot Post-Trial at 9. In *Kurlemann*, the Sixth Circuit rejected a Section 1014 jury instruction that said a statement may be false "when it contains a half-truth or when it conceals a material fact." 736 F.3d at 444. The Sixth Circuit, looking to the text of Section 1014, concluded that the statute prohibits what it states it prohibits, namely, false statements to or reports to banks. *Id.* at 445. No more, no less. Put another way, Section 1014, according to the Sixth Circuit, does not prohibit "half-truths," "material omissions," or "concealments," the very issues in that case. *Id.* The Sixth Circuit therefore held that a Section 1014 conviction cannot rest on material omissions or implied misrepresentations: "Until Congress opts to extend § 1014 to material omissions, implied misrepresentations or fraud—all ways of getting at deceptive 'half truths'— we must take the statute as we find it, and as the Supreme Court has construed it." *Id.* at 449–50. Admittedly, if *Kurlemann* were the law in the Seventh Circuit, Thompson's argument would have more traction. But *Kurlemann* is an out-of-circuit case,[10] and Thompson has failed to direct the Court to a Supreme Court case or

---

[10]For the same reason, the Court is not bound by the other cases cited by Thompson in support of his literal falsity argument. *See* Mot Post-Trial at 8–9 (citing *United States v. Attick*, 649 F.2d 61, 63 (1st Cir. 1981); *United States v. Watts*, 72 F. Supp. 2d 106, 117 (E.D.N.Y. 1999)).

Seventh Circuit case that holds that a Section 1014 conviction requires a literally false statement.

A recent decision from the Seventh Circuit, moreover, indicates that the Seventh Circuit does not require literal falsity in Section 1014 cases. In *United States v. Freed*, 921 F.3d 716, 723 (7th Cir. 2019), the defendant was convicted of two counts under Section 1014. 921 F.3d at 723. He was convicted on both counts for presenting false information to a bank consortium in the form of slides, which described "the proposed 'Line of Collateral' which included representations that [defendant's company] owned one hundred percent of the TIF notes, the cost to sell them was $ 0, and the proceeds of that sale would be $ 7,698,000." *Id.* The defendant argued there was insufficient evidence demonstrating that he knowingly made false statements because "his statements were technically true." *Id.* The Seventh Circuit rejected his argument, finding that the defendant's "representations at these meetings would not naturally be understood as simply stating facts about unavailable collateral, information that would have been useless to the banks. The presentation clearly indicated the project note was available to serve as collateral for the loan modification, a representation that the government proved was false." *Id.* In support, the Seventh Circuit cited the dissent in *Williams*, which stated that "the Courts of Appeals have held that the failure to disclose material information needed to avoid deception in connection with loan transaction covered by § 1014 constitutes a 'false statement or report,' and thus violates the statute." *Id.* (citing *Williams*, 458 U.S. at 296). The Seventh Circuit therefore found that a reasonable juror could find that the

defendant's representations were false and affirmed the district court's denial of the motion for acquittal.[11]

Because neither party cited *Freed* (the Court found *Freed* while conducting its own research), the Court set a motion hearing to allow the parties to address the case.[12] R. 168. At the motion hearing, Thompson argued that *Freed* does not apply because the charged statements in that case were literally false. Thompson further observed that the Government in *Freed* had argued that the defendant's statements were literally false. In response, the Government argued that *Freed* is on point, and is consistent with the law cited by the Government in its response brief.

The Court finds that neither party's position at the motion hearing hit the mark precisely. For instance, the Court disagrees with Thompson that *Freed* is inapposite due to the fact that some of the defendant's statements were literally false, or because the government argued that the statements were literally false. Unlike in *Krilich*, Thompson's lead case, the court in *Freed* did not reject the defendant's literally true argument out of hand due to the fact that the charged statements were literally false. *See Krilich*, 159 F.3d at 1029. Instead, the *Freed* court engaged with the defendant's assertion that his statements were technically true and held that the

---

[11]When denying the defendant's motion for judgment of acquittal, the district court rejected the defendant's argument that "'literal truth' is a complete defense to a false statement charge." *United States v. Freed*, 2016 WL 6618517, at *5 (N.D. Ill. Nov. 9, 2016), *aff'd*, 921 F.3d 716 (7th Cir. 2019).

[12]The Court was tasked with deciding whether a Section 1014 conviction, as a matter of law, requires literal falsity, so the Court could not ignore Seventh Circuit precedent, even if the parties failed to cite it. *See Palmer v. Bd. of Educ. of Cmty. Unit Sch. Dist. 201-U, Will Cnty., Ill.*, 46 F.3d 682, 684 (7th Cir. 1995) (citations omitted) ("A court should apply the right body of law even if the parties fail to cite their best cases.").

statements nevertheless constituted false statements for purposes of Section 1014 because "Freed's representations at these meetings *would not naturally be understood* as simply stating facts about unavailable collateral . . . The presentation *clearly indicated* the project note was available to serve as collateral for the loan modification, a *representation that the government proved was false.*" 921 F.3d at 723 (emphases added). As stated above, in support, the Seventh Circuit quoted the following language from the *Williams* dissent: "the Courts of Appeals have held that the failure to disclose material information needed to avoid deception in connection with loan transaction covered by § 1014 constitutes a 'false statement or report,' and thus violates the statute." *Id.* (quoting 458 U.S. at 296). Thus, contrary to Thompson's arguments, the court in *Freed* did not reject the defendant's arguments because they were literally false, or because the government in that case argued that the defendant's statements were literally false.

At the same time, while the Court agrees with the Government that *Freed* is applicable, the Court disagrees that *Freed* is simply "consistent" with the authority cited by the Government in its Response, *see supra* Section I.A.1.a.ii n.9, as the court in *Freed* directly rejected a defendant's Section 1014 literal falsity argument and indicated that literal falsity is not required in the Seventh Circuit.

Based on the above, the Court finds that, in the Seventh Circuit, literal falsity is not required to sustain a conviction under Section 1014. As a result, when construing the evidence—including the testimony of Murray, Holly, and Newell, as well as the audio recording and the communications log—in the light most favorable

to the Government, a reasonable jury could conclude beyond a reasonable doubt that Thompson knowingly made false statements as charged in Counts I and II. Because the Court finds that literal falsity is not required to sustain a Section 1014 conviction, the Court does not address the Government's argument that Thompson's statements were literally false. *See* Resp. at 6–7.

### b. Statement About Purpose of Loan (Count II)

As to the second statement charged in Count II (that Thompson falsely stated to the FDIC that "these funds were for home improvement, when . . . the $110,000 was paid to a law firm as defendant's capital contribution"), Thompson maintains that no rational jury could have found that Thompson made the statement that the loan was used for "home improvement." Mot. Post-Trial at 6. The communications log, Thompson points out, showed that in the March 1, 2018 conversation, the parties discussed two loans in very similar amounts, the ward office[13] loan and the personal loan. *Id.* (citing GX 191; Tr. 1019–1020). Although the log shows that Thompson said both loans were for building "improvements," Thompson argues that the evidence shows that is not what he said. *Id.* Specifically, argues Thompson, Holly admitted that, although the log separated the discussion of the ward and personal loans into two paragraphs, there was no separation in the conversation, allowing for confusion. *Id.* (citing Tr. 1025–26, 1035, 1049).

The Government, on the other hand, points out that both Holly and Newell testified that Thompson told them on March 1, 2018 that the loan was for home

---

[13]Thompson was the alderman of the 11th Ward of the City of Chicago. Tr. 795:7–19.

improvement. R. 159, Resp. at 5 (citing Tr. 1034, 1078). Additionally, the Government argues that the communications log itself shows states that during the March 1, 2018 call, Thompson stated that "John Gembara loaned him 110,000 for home improvement, which was to be rolled up into his home loan." *Id.* (citing GX 191; Tr. 1009, 1083).

Even if there were inconsistencies in the testimony or errors in the log, the Court must respect the weight that the jury assigned to conflicting evidence and the inferences that the jury drew. Resp. at 5; *see Godinez*, 7 F.4th at 638–39 (citations omitted). On the record, the Court finds that a reasonable jury could have concluded beyond a reasonable doubt that Thompson told Holly and Newell that the loan was for home improvement.

## 2. Knowledge of Falsity

Thompson next argues that the Government failed to prove the second element of Section 1014 beyond a reasonable doubt that Thompson knew the charged statements as to the amount he owed were false—that is, that he knew at the time he made the statements to PHL and the FDIC that he owed $269,00. Mot. Post-Trial at 11. As stated above, in order to convict under Section 1014, the Government must prove beyond a reasonable doubt that Thompson knowingly made the charged false statements. *See Lane*, 323 F.3d at 580 (internal citations omitted). Thompson points to testimony that he argues shows that he did not know how much he borrowed. Specifically, Murray testified that Thompson was trying to figure out his loan balance. Mot. Post-Trial at 11–12 (citing Tr. 1180). Similarly, Holly testified that, at

the time of the March 1, 2018 conversation, Thompson "didn't realize—I don't think he realized it was that much" (Tr. 1011:12–24, 1033:2–8), and Newell testified that Thompson "didn't know what he owed" (Tr. 1091:19–25). *See* Mot. Post-Trial at 12. Holly testified that, when Holly revealed the full amount borrowed four days later, "[Thompson] was surprised I'll put it that way." *Id.* (citing Tr. 1050–1051).

The Government, on the other hand, points to evidence that Thompson personally picked up his $20,000 and $89,000 loan distribution checks. Resp. at 11; *see* 461:15–463:25, 465:8–467:16. The Government also argues that the evidence showed that Thompson repeatedly learned of the increasing balance of his loan, specifically pointing to: (1) an email Thompson received from Gembara on May 23, 2014 showing the current balance of his loan with interest as $232,273.82 (GX 59); (2) March 2016 loan applications where Thompson acknowledges that the loan balance is more than $249,000 (GX 102 at 3; GX 103 at 3); and (3) Thompson's 2016 tax returns showing the loan in the amount of $249,049.96 (GX 216 at 9). Resp. at 11–12. Both parties argue that DX 87/GX 68 supports their position—it is an envelope on which Thompson wrote, "Tax" in large letters, followed by, "Washington Fed," "$249,049.96" and "?". Mot. Post-Trial at 12; Resp. at 11–12. Thompson asserts that the question mark demonstrates that Thompson did not believe at any time he owed the $249,000 figure. Mot. Post-Trial at 12. The Government, in contrast, argues that this document shows that he knew he owed more than $110,000 on his Washington Federal Loan. Resp. at 11–12.

When viewing all of the evidence in the light most favorable to the Government, there was sufficient evidence to support the jury's finding that Thompson knew he owed more than $110,000. The Court agrees with the Government that a rational jury could have chosen to disregard Holly and Newell's speculation about Thompson's knowledge—or lack thereof—of the loan amount; the jurors, unlike Holly and Newell, were aware of additional documents showing Thompson's knowledge of the loan amount. Resp. at 12; *see United States v. Peterson*, 823 F.3d 1113, 1120 (7th Cir. 2016) (in reviewing a motion for a judgment of acquittal, the Court's task is not to "reweigh the evidence or invade the jury's province of assessing credibility"). In sum, there was sufficient evidence for a rational jury to find that Thompson knew that he owed more than $110,000 when he made the statements charged in Counts I and II.

### 3. Home Improvement Statement Made to Influence

Finally, in support of his motion for judgment of acquittal on Count II, Thompson argues that there was insufficient evidence on the third element of Section 1014 with respect to the statement that the 2011 loan was for "home improvements." Mot. Post-Trial at 13. Specifically, he contends that the statement that the 2011 loan was for "home improvements" "could not possibly have been made for the purpose of influencing anyone in the collection of the debt." *Id.* He argues that the Government failed to offer any evidence showing that the alleged use of the funds in 2011—whether for home improvement or for a buy-in to Thompson's law firm— was for the purpose of influencing, or did influence, the FDIC in 2018. *Id.*

34

To convict under Section 1014, the Government must prove beyond a reasonable doubt that Thompson knowingly made the charged false statement "for the purpose of influencing in any way the action" of the FDIC. *See Lane*, 323 F.3d at 583 (internal citations omitted). The Government correctly points out, and Thompson does not dispute, *see Reply* at 11, that it is not a defense to § 1014 "to say that the statements were not influential or the information not important," as materiality is not an element of Section 1014. Resp. at 13 (quoting *Wells*, 519 U.S. at 494 (internal quotation marks omitted)). To sustain a conviction under Section 1014, the Government only has to prove that the "speaker knows the falsity of what he says and intends it to influence the institution." *Wells*, 519 U.S. at 499; *see also United States v. Glassey*, 715 F.2d 352, 353 (7th Cir. 1983) (per curiam) ("[A]ctual reliance by the [financial institution] on a defendant's false statements is not necessary for a conviction under § 1014.").

In support of the jury's finding of intent, the Government points to Thompson's statement to Murray on February 23, 2018 that there was no mortgage on the $110,000 he borrowed from Washington Federal, and that he had "just signed a Promissory Note" in 2011. Resp. at 12 (citing GX 188); *see also* GX 189 at 6:24–7:2. Thompson's residential address was listed at the top of the note. Resp. at 12 (citing GX 89). During the call, Thompson told Murray that he would like to "quickly move forward," asking if someone could "get back to him" in a week. *Id.* (citing GX 188); *see also* GX 189 at 7:13–8:3, 11:10–12. Thompson also indicated he knew the bank president was deceased, and that there had been "some financial impropriety" at

Washington Federal. Resp. at 12 (citing GX 188); GX 189 at 3:9–22. About one week later, on March 1, 2018, Thompson told Holly and Newell that the loan was for home improvements. Resp. at 13; Tr. 1034:19–23, 1078:22–25; GX 191. According to the Government, based on the above evidence, it is a reasonable inference that Thompson knew or strongly suspected that there was not much paperwork related to his loan, apart from the note, and Gembara (the individual with the most knowledge of his loan distributions) was deceased. Resp. at 13. Additionally, argues the Government, the evidence allowed the jury to reasonably infer that Thompson believed that if he made representations to the FDIC consistent with what appeared on the note (which included his residential property address), the FDIC was less likely to look for any additional paperwork and find the two additional loan distributions. *Id*. These inferences, according to the Government, are supported by Thompson's insistence during the phone call that he wanted to resolve the situation quickly, and by his general knowledge of mortgages from his practice as a real estate attorney. *Id*.

Thompson replies that the Government's argument "is either an exercise in illogic or an effort to distract," as the evidence might support evidence of intent to influence the FDIC about the amount Thompson borrowed, but has nothing to do with his alleged statement that the money was borrowed for home improvements. Reply at 12. The Court disagrees. True, the Court would not have been surprised if the jury had returned a not guilty verdict, but it matters not, as it is not the role of the trial judge, on a Rule 29 motion, to reweigh the testimony; the Court must "respect the exclusive function of the jury to determine the credibility of witnesses, resolve

evidentiary conflicts, and draw reasonable inferences." *Godinez*, 7 F.4th at 638–39 (internal quotation marks and citation omitted).

Here, the evidence before the jury consisted of several different facts (in the form of Thompson's conversations with Murray and with Holly and Newell, in addition to the Note itself), which could lead the jury to draw a reasonable inference (that is, Thompson told the FDIC that the loan was for home improvements in order to avoid the FDIC looking closely at all documentation and discovering the additional two loan disbursements). When examining the entirety of the evidence, the Court finds that it was sufficient for the jury to infer that Thompson told the FDIC that the loan was for home improvements in order to influence the FDIC's collection of the money he owed.

Accordingly, in viewing the evidence and all reasonable inferences in the Government's favor, as the Court must, the Court finds that there was sufficient trial evidence of Thompson's guilt to support his convictions under Counts I and II.

**B. Counts III through VII**

In Counts III through VII, Thompson was convicted of filing false tax returns for tax years 2013 through 2017 in violation of 26 U.S.C. § 7206. To find a defendant guilty of a charge under Section 7206, the Government must prove the following elements beyond a reasonable doubt: (1) The defendant caused someone to prepare an income tax return; (2) the income tax return was false as to a material matter, as charged in the Count; (3) the defendant signed the income tax return, which contained a written declaration that it was made under penalties of perjury; (4) the

defendant acted willfully, that is, he knew that he had a legal duty to file a truthful tax return, but when he signed the return, he did not believe it was truthful as to a material matter; and (5) the defendant filed or caused someone to file the income tax return with the Internal Revenue Service. Seventh Circuit Pattern Criminal Jury Instructions, 26 U.S.C. § 7206(1) (2020); *see also* Tr. 1327:8–25. Thompson argues that because there was insufficient evidence to show willfulness, the Court should grant a judgment of acquittal on Counts III through VII as well, as no rational jury could have found Thompson guilty beyond a reasonable doubt on those charges. Mot. Post-Trial at 13–14.

More specifically, Thompson contends that the Government failed to introduce evidence that Thompson read the tax returns, saw references to Washington Federal in a stack of paper "buried many dozens of pages in," or saw the Form 1098s reflecting the deductions for mortgage interest paid. Mot. Post-Trial at 14. And the tax planners, according to Thompson, rather than evidencing his willfulness, are actually exculpatory, as Thompson never claimed any credit for Washington Federal mortgage interest. *Id.* at 14–15 (citing Tr. 682–83). Thompson insists that this evidence, combined with the undisputed evidence that Thompson's accountants never discussed the Washington Federal deductions with him before December 7, 2018, as well as the fact that when he discussed the deductions with Hannigan in 2018, Thompson asked, "[h]ow did this happen?", warrant a judgment of acquittal on Counts Three through Seven. *Id.* at 14–15 (citing Tr. 735, 737).

The Government, on the other hand, points to a multitude of evidence introduced at trial that supports the jury's finding that Thompson acted willfully with respect to his tax returns. For instance, the government highlights evidence that: (1) Thompson provided the Washington Federal Forms 1098 to his accountants for tax years 2013–2016 (GX 204, 208, 212, 216); (2) Thompson opened the envelopes containing his tax documents prior to providing them to his accountants (Tr. 348, 363), at times writing information from those forms into his tax organizers (*see, e.g.*, GX 203 at 11; GX 211 at 19); (3) Thompson filled out tax organizers which listed the Washington Federal deduction from the prior year, including instances where Thompson wrote on the page with that notation (*see* GX 203, GX 207, GX 211, GX 215, GX 219); (4) Thompson wrote specific notes to his accountants about mortgage interest and/or Forms 1098 (*see* GX 35, GX 215 at 1, GX 216 at 27); (5) Thompson sent email and text messages to his accountants with questions about his tax returns after he reviewed them (*see* GX 251, GX 255, GX 269); and (6) Thompson opened the envelope containing his 2016 Washington Federal Form 1098 and wrote the loan balance listed on the Form 1098 on the envelope (*see* GX 68). Resp. at 14.

As for the 2017 tax year, the Government observes that before the filing of the return, Thompson received an email from Hannigan, informing Thompson that the Washington Federal mortgage interest for 2017 was estimated to be $10,000 for tax purposes. *See* Resp. at 14 (citing GX 256). The Government furthermore introduced evidence that Thompson responded to several portions of the email, which the Government contends demonstrates that Thompson read this email and knew of its

contents. *Id.* (citing GX 199, GX 259, GX 257). Thompson does not dispute any of this evidence in reply. *See* Reply.

It is well established in the Seventh Circuit that proof of willfulness in tax cases is "most often made through circumstantial evidence." *United States v. Walsh*, 627 F.2d 88, 92 (7th Cir. 1980) (citation omitted); *see also United States v. Hills*, 618 F.3d 619, 638 (7th Cir. 2010) (citation omitted). As the Government correctly states, "[f]ailure to supply an accountant with accurate information is evidence of willfulness." Resp. at 15 (quoting *United States v. Powell*, 576 F.3d 482, 495 (7th Cir. 2009)). And evidence that Thompson reviewed the tax organizers and prepared returns provided by his accountants is circumstantial evidence that he was aware of the contents of those documents, including the Washington Federal deduction. *Id.* (citing *United States v. Creasia*, 316 Fed. App'x. 558, 559 (9th Cir. 2008) (knowledge inferred from defendant's "review[ of] his tax returns (including pointing out an error that his tax preparer had made on a previous return)")).[14]

The Court finds that the Government introduced sufficient circumstantial evidence at trial that Thompson knew that the Washington Federal deduction was on his tax returns for all charged tax years. The Court therefore denies Thompson's motion for judgment of acquittal on Counts III through VII.

---

[14]Although, as a non-published out-of-Circuit case, *Creasia* is not binding on this Court, the Court finds the proposition of law as cited by the Government, to be persuasive. Moreover, Thompson did not oppose it in his Reply brief, so any argument on the case is waived. *See Bonte*, 624 F.3d at 466 ("Failure to respond to an argument . . . results in waiver.").

## II.     Motion for a New Trial

In the alternative, Thompson moves for a new trial, taking the position that: (1) the verdicts are against the manifest weight of the evidence, (2) the Government engaged in prosecutorial misconduct during closing arguments, (3) the Court erred in certain rulings on motions *in limine* and evidence, and (4) the Court erred by failing to provide a specific jury instruction. Mot. Post-Trial at 15–25.

### A. Weight of the Evidence

A court may grant a new trial if the jury's verdict is "so contrary to the weight of the evidence that a new trial is required in the interest of justice." *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999) (when considering a motion for a new trial, "the court considers whether the verdict is against the manifest weight of the evidence, taking into account the credibility of the witnesses"). In that vein, a court "may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable. . . . The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand. . . . Motions for new trial based on weight of the evidence are not favored. Courts are to grant them sparingly and with caution, doing so only in those really exceptional cases." *United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989) (internal quotation and citation omitted); *see also United States v. Coscia*, 4 F.4th 454, 465 (7th Cir. 2021) (citations and quotations omitted) ("Granting a new trial in the 'interest of justice' is reserved for only the most extreme cases, and [the Seventh Circuit]

41

approach[es] such motions with great caution and [is] wary of second-guessing the determinations of both judge and jury.").

Thompson asserts few arguments in support of his motion for a new trial based on the sufficiency of the evidence that were not raised in his motion for judgment of acquittal. *See* Mot. Post-Trial at 17. The Court addresses only the arguments he advances specifically under the Rule 33 standard.

As an initial matter, the Court reiterates its findings that literal falsity is not required for a conviction under Section 1014 and that there was no constructive amendment or variance between the offenses charged in Counts I and II of the indictment and the evidence at trial; as such, under the Rule 33 standard, the Court finds that the interests of justice do not mandate a new trial on those points. *See* Mot. Post-Trial at 16.

Thompson points to *United States v. Herrera*, in which the Fifth Circuit upheld the district court's granting of a new trial. Mot. Post-Trial at 16 (citing 559 F.3d 296, 302–303 (5th Cir. 2009)). Thompson appears to rely on *Herrera* for his argument that there was insufficient evidence of his willfulness or of a specific intent to avoid paying taxes. Mot. Post-Trial at 16–17. However, he does not explain how the facts of *Herrera* are similar to the facts here. *Id.* No matter, as the Court finds *Herrera* to be inapposite. First, *Herrera*, a Fifth Circuit case, is not binding on the Court. Second, and more importantly, in *Herrera*, the Fifth Circuit (applying an abuse of discretion standard), affirmed the district court's grant of a new trial on the basis that the

evidence "preponderated heavily against the guilty verdict."[15] *Herrera*, 559 F.3d at 302–303. By contrast, here, for the reasons discussed above, *see supra* Section I.B, the Court finds that there was sufficient evidence at trial in support of Thompson's willfulness in making false statements on his tax returns, such that this is not an "exceptional case" that warrants a new trial.

Next, Thompson argues that the errors in the FDIC's communications log and Holly's and Newell's testimony, which revealed mistakes of memory and errors, showed that that evidence was insufficient to convict Thompson for the false statement relating to the $110,000 loan being used for "home improvement." Mot. Post-Trial at 16; Reply at 12–13. Although the Court agrees that there were inconsistencies in the communications log and Holly and Newell's testimony, for the same reasons discussed above, *see supra* Section I.A.1.b, it does not find the evidence to be so incredible that it warrants setting aside the jury's verdict. *See Coscia*, 4 F.4th at 465 (courts are wary to set aside the jury's determination); *see also Washington*, 184 F.3d at 657 (where verdict is not against the manifest weight of the evidence, the court should not set aside the verdict simply because it feels some other result would be more reasonable). The same goes for Thompson's argument that he intended to influence the FDIC by falsely stating that the $110,000 loan was for home improvements. *See id.*; Reply at 11.

---

[15]The Fifth Circuit reversed the district court's grant of a judgment of acquittal, however, finding that the jury reasonably could have concluded that the defendant acted willfully based on the evidence introduced at trial. *Herrera*, 559 F.3d at 302.

For the reasons discussed above, the Court finds that the jury's verdict on all Counts was not contrary to the manifest weight of the evidence. As such, the Court denies Thompson's motion for a new trial on the basis of the sufficiency of the evidence.

### B. Closing Arguments

Thompson argues that the Government's closing argument and rebuttal argument were "highly improper and prejudicial" and as such, a new trial is necessary. Mot. Post-Trial at 18. "The district court has broad discretion in deciding whether to grant a new trial based on prosecutorial misconduct." *United States v. Freeman*, 650 F.3d 673, 683 (7th Cir. 2011). When evaluating claims of prosecutorial misconduct based on closing argument, a court must "first determine whether the remarks by the prosecutor were improper when viewed in isolation"; if not, the analysis ends there. *United States v. Carswell*, 996 F.3d 785, 796 (7th Cir. 2021) (internal citation omitted). If the prosecutor's remarks were improper, the court must "evaluate them in light of the entire record and determine whether they deprived the defendant of a fair trial," including considering the following factors: "(i) whether the prosecutor misstated the evidence; (ii) whether the remark implicated the specific rights of the accused; (iii) whether the defense invited the response; (iv) the effect of any curative instructions; (v) the defendant's opportunity to rebut; and (vi) the weight of the evidence." *Id.* (internal citations omitted). "Improper prosecutorial statements during closing argument rarely constitute reversible error[,] and [a defendant so

arguing] faces an uphill battle." *United States v. Chavez*, 12 F.4th 716, 728 (7th Cir. 2021) (internal quotations and citations omitted).

Although "prosecutors may not infuse their closing arguments with facts that the court has not admitted into evidence, they may argue reasonable inferences from the evidence that the jury has seen and heard." *United States v. Waldemer*, 50 F.3d 1379, 1383 (7th Cir. 1995) (internal citation omitted). A prosecutor may argue reasonable inferences related to the defendant's intent, so long as those inferences can be reasonably drawn from the evidence. *See. e.g.*, *United States v. Della Rose*, 403 F.3d 891, 906–907 (7th Cir. 2005) (government's argument that defendant produced to the government photocopies of a document rather than originals "to make it more difficult for a handwriting expert to detect a forged signature" was "an argument with a basis in inferences that could reasonably be drawn from the testimony").

With this legal backdrop in place, the Court turns to Thompson's prosecutorial misconduct arguments.

### 1. Thompson's "Plan"

Thompson first takes issue with the theme of the Government's closing, and the arguments made in support, namely, that Thompson's conduct between February 23, 2018 (when he called PHL) through December 7, 2018 (when he spoke to Hannigan about the Washington Federal deductions) was part of a premeditated "plan" to trick PHL and the FDIC, so he could pay less than what he owed. Mot. Post-Trial at 18 (citing Tr. 1334, 1341, 1347, 1352, 1368, 1370). Thompson also takes umbrage with the Government's statements that Thompson was "hoping and

praying" that PHL and the FDIC would not catch on to his plan, that they would not "dig deeper," and that they would not learn about the advances. *Id.* at 19 (citing Tr. 1346, 1350–51, 1363). Thompson submits that there was no evidence introduced at trial of any "plan" or "scheme," nor that Thompson was "hoping and praying" not to get caught, and therefore he contends that these comments misstated the evidence. *Id.* Thompson points to Murray's testimony that Thompson called the PHL service line to ask for help in determining what his loan balance was. *Id.* (citing Tr. 1180). Along the same lines, Thompson argues that the Government's argument that Thompson "acted surprised" and "confused" as part of his "act," was improper because it too was unsupported by the evidence. *Id.* (citing Tr. 1334, 1351–52, 1368). Namely, Thompson argues that Holly and Newell's testimony that Thompson *was* surprised when he was provided with information about the full amount of the loan, contradicts the Government's statements. *Id.* (citing Tr. 1011, 1045, 1080, 1091).

Similarly, Thompson maintains that the Government's arguments relating to the tax counts (Counts Three through Seven) were improper, in that it argued that that after being visited by federal agents on December 3, 2018, Mr. Thompson took "a couple days to hatch a plan" and then executed the plan by speaking with Mr. Hannigan on December 7, 2018. Mot. Post-Trial at 19–20 (citing Tr. 1368). Thompson contends that not only was there no evidence of any such plan, but also that the Government's argument directly conflicted with the evidence, as Hannigan testified that Thompson called with a question about his re-financing, and that it was

Hannigan that raised the issue of the deductions, not Thompson. *Id.* at 20 (citing Tr. 725, 730–31).

As an initial matter, the Government argues that Thompson did not object to these statements during the Government's closing, and as such, he has forfeited the argument.[16] Resp. at 18–19. Thompson concedes as much. Reply at 13. The Court therefore examines Thompson's arguments under a plain error standard. *See United States v. Hicks*, 15 F.4th 814, 816 (7th Cir. 2021) (failure to object closing argument results in forfeiture and court reviews forfeited issues for plain error).

The Court agrees with the Government that its arguments about Thompson's "plan" were proper inferences from the evidence introduced at trial—specifically that Thompson made similar statements about his loan to both PHL and the FDIC, two different agencies working to collect the loan. Resp. at 19. It is not an unreasonable inference that Thompson had a "plan" to mislead PHL and the FDIC into not collecting the full amount of his loan based on his repeated misrepresentations. *See Waldemer*, 50 F.3d at 1383. Nor is it an unreasonable to infer from the evidence that Thompson "hoped" that those entities would not find the additional loan. *See Della Rose*, 403 F.3d at 906–907. Similarly, the Court cannot say that it was an unreasonable inference that Thompson would have made a "plan" about what he was going to say about his Washington Federal loan when he called Hannigan, his accountant, based on the evidence that Thompson waited several days after being

---

[16]The Court disagrees with the Government, however, that Thompson waived the argument by failing to object during closings, Resp. at 18–19, as such failure was not the "the intentional relinquishment of a known right," *Olano*, 507 U.S. at 733.

approached by law enforcement about that loan to call Hannigan. *See id.* As a result, there was no error, let alone a plain error, in the Government's arguments about Thompson's "plan."

The same is true with respect to the Government's statements regarding Thompson's feigned surprise. The evidence at trial regarding Thompson's knowledge of his loan balance prior to the February 2018 call with PHL, as well as the evidence concerning the falsity of his tax returns support the reasonable inference that Thompson pretended to be surprised about: (1) the total amount of the loan on his call with Newell and Holly; and (2) the contents of his tax returns when speaking with Hannigan after his interview with law enforcement. *See* Resp. at 19–20. Even if the Government's statements in isolation were improper, in light of the conflicting evidence about Thompson's surprise (*e.g.*, Newell and Holly's testimony that Thompson was surprised about the full loan amount, and Hannigan's statement that he raised the issues of the deductions on the post-law enforcement call), the Court cannot say, under a plain error standard, that the Government's comments deprived Thompson of a fair trial. The Government's closing arguments about Thompson's plan and feigned surprise are therefore not a basis for a new trial.

### 2. Misstatements Unsupported by Evidence

Thompson also argues that the Government engaged in misleading arguments by making up testimony, two instances of which Thompson's counsel objected to. First, Thompson contends that the Government falsely argued, "You heard Mr. Holly and Mr. Newell say that while they were talking to him, they were talking – they

ended up talking about his personal debt. He told them he borrowed $110,000 and that he didn't owe that higher amount, that balance of $269,000." Mot. Post-Trial at 20 (citing Tr. 1348). Thompson points out that the evidence showed that no one even mentioned the $269,000 on the call, and that there was no discussion at all about what was owed (as opposed to borrowed). *Id*. The Government responds that its statement was a reasonable inference based on the evidence that, (1) as of March 1, 2018, Thompson knew that the balance that the FDIC was seeking to collect was approximately $269,000 (GX 72, GX 188); and (2) that during this call, Thompson told Holly and Newell that he disputed his balance (GX 191; Tr. 1079:1–8). Resp. at 17.

As discussed above, *see supra* Section I.A.1.a, it was a reasonable inference from the evidence that Thompson's claim that he was disputing that higher balance was intended to convey, in substance, that he did not owe that amount. Additionally, as the Government points out, in his closing, Thompson's counsel argued that it was *not* a reasonable inference that Thompson was stating he did not owe a higher amount. Resp. at 17 (citing Tr. 1389–1393 ("In fact, on the call, Holly and Newell were asking him how much he borrowed, not how much he owed, and there's a difference between what you borrow and what you owe.")). As stated above, the Court does not find that the Government's argument was a misstatement of the evidence. Even if it were a misstatement of evidence, Thompson's counsel's ability to rebut the argument, combined with the Court's reminders to the jury that closing arguments are not evidence, support a finding that Thompson was not deprived of a fair trial. *See United States v. Wolfe*, 701 F.3d 1206, 1213 (7th Cir. 2012) (a defendant's

"opportunity to respond . . . during his closing argument" and the district court's instruction to the jury "before and after closing arguments that the attorney's statements were not to be taken as evidence" weighed in favor of a finding that defendant was not prejudiced by a misstatement of the evidence).

Second, Thompson argues that the Government not only made up evidence but also violated the Court's ruling on a motion *in limine* by arguing: "At some point also, he acknowledged that that $110,000 was for his law firm buy in, and you also heard Mr. Newell say that Mr. Holly and Mr. Newell were not the only people talking to the defendant. There was another person, John Mallaber, from planet home who was also talking to him during this time period and it may have been John Mallaber." Mot. Post-Trial at 21 (citing Tr. 1351). According to Thompson, there was no proof of any discussions between Thompson and Mallaber, and the Government's argument violated the Court's order barring any testimony about attempts to repay the loans, including evidence concerning interactions between the FDIC and Mallaber of PHL. *Id.*

The Government retorts that the argument did not violate the Court's rulings on any motions *in limine*. The Court agrees. As the Government points out, the Court excluded evidence of Thompson's efforts after March 1, 2018 to repay his Washington Federal Loan, not all testimony from or related to Mallaber. Resp. at 18 (citing R. 95 at 3–4). Indeed, the Court, in ruling on the parties' motions *in limine* and proposed trial exhibits, explicitly allowed admission of certain communications between Thompson and Mallaber where Thompson made representations about the

characteristics of his loan. *Id.* (citing R. 95 at 21 (denying Thompson's Motion *in limine* to exclude GX 196)). The Government's argument at closing relating to Mallaber does not relate to evidence about Thompson's attempts to repay the loan, and as such was not excluded by the Court's motion *in limine* rulings.

The Court also agrees with the Government that its argument in closing that "it might have been John Mallaber" (meaning the person Thompson told that the $110,000 was for his law firm buy-in) was a reasonable inference to make from the evidence introduced at trial. Resp. at 17–18. As the Government asserts, Holly and Newell both testified that PHL had primary responsibility for Thompson's loan, Tr. 1006, and the evidence at trial showed that employees from PHL were communicating with Thompson about that loan as early as February 2018. *See* GX 188; Resp. at 18. At trial, when asked about an April 2018 email where Newell wrote to Thompson and told him that the $110,000 distribution "was confirmed by you as your buy in to the firm," GX 199, Newell testified that Thompson did not make that confirmation on March 1, and that, "I don't recall when he did that. I don't recall if he told John Mallaber with Planet Home." Tr. 1098–99. Contrary to Thompson's argument that such a statement is "the absence of evidence" from which the Government could not reasonably draw an inference, Reply at 14, evaluating Newell's testimony in context—in which he affirmatively mentioned Mallaber's name as a possible source of the information, despite his lack of certainty—could support an inference that the source of the information "might have been John Mallaber."

Even assuming the impropriety of the Government' statement, Thompson was not deprived of a fair trial, given that the statement was made during the Government's opening close, Thompson's counsel had the ability to rebut the argument, and, as stated above, the Court reminded the jury multiple times that closing arguments are not evidence. *See Wolfe*, 701 F.3d at 1213. The Court also disagrees with Thompson that any potential misstatement was a "fundamental error on a key element of the prosecution." Reply at 14. Newell testified that Thompson did not state that the loan was for his law firm buy-in during the call on March 1, 2018, and Holly testified that Thompson may have so stated in an email not reflected in the communications log. Tr. 1041, 1100. As stated above, they both testified that Thompson told them that the loan was for "home improvements" during the March 1, 2018 call. Tr. 1034:19–23, 1078:22–25. Whether Thompson might have told Mallaber, or informed Holly and Newell in a different way after the March 1, 2018 call, does not directly go to the elements of the charged offense. As such, the Court cannot find that, even if the Government's argument as to Mallaber during closing constituted a misstatement of the evidence, that it was so egregious as to deprive Thompson of a fair trial. *See Carswell*, 996 F.3d at 796.

### 3. Voters

Thompson next argues that, in rebuttal, the Government made improper arguments that Thompson was blaming the voters for his problems. Mot. Post-Trial at 21; Reply at 14. Specifically, Thompson takes issue with the following:

> Mr. Netols: And then, of course, I guess the voters are probably at fault, too, because by electing him to his public offices –

52

> Mr. Gair: Your Honor, I object.
> The Court: Sustained.
> Mr. Netols: He's talked about his public offices.
> The Court: Sustained.
> Mr. Netols: He's overscheduled for all of these reasons. It's all – it's everyone else's fault.

*Id.* at 21–22 (citing Tr. 1419). Thompson posits that the Government improperly sought to tie Thompson's position as an alderman to charges that had nothing whatsoever to do with his public office and urged to jury to use this as a basis to convict him of wholly unrelated crimes. Mot. Post-Trial at 22.

The Government points out it was Thompson's counsel who referred to Thompson's position as an alderman during closing, arguing that Thompson was "inattentive to detail" and that the errors on his taxes were mistakes, "[b]ecause he's got information overload or because he's not paying sufficient attention because what he cares about is the people in his ward. What he cares about is helping people. He's not worrying about the details of taxes." Resp. at 20 (citing Tr. 1400, 1401). Additionally, at the close of the argument, Thompson's counsel explicitly referenced Thompson's position as an alderman, asking the jury to "[s]end Mr. Thompson back to his family, and to his job, to helping the constituents, his constituents and the people who live in the City of Chicago." Tr. 1408–09. The Government further notes that Thompson also introduced evidence about his aldermanic position and his duties in that role. Resp. at 20–21 (citing Tr. 1193).

The Government contends that its at-issue comments were a response to Thompson's efforts to tie his job as an alderman to his lack of intent to file false tax returns. Resp. at 20–21. True, the Court found the Government's argument about

Thompson "blaming the voters" to be inappropriate, as demonstrated by sustaining Thompson's counsel's objection. But the Court agrees with the Government that, although an improper—and clunky—way of doing so, the Government's rebuttal, taken in context, was a response to Thompson's counsel's closing argument that Thompson lacked intent to file false tax returns due to being extremely busy based, in part, on his job as an alderman. *Id.* Because the Court sustained the objection and, as noted previously, repeatedly instructed the jury that closing arguments are not evidence, the Court finds that the Government's comments about voters were not so outrageous and extreme as to deprive Thompson of a fair trial. *See Chavez*, 12 F.4th at 732.

### 4. Shifting Burden of Proof

Next, Thompson asserts that the Government's rebuttal improperly urged the jury to ignore the evidence and shifted the burden of proof. Mot. Post-Trial at 22–23. Specifically, Thompson takes issue with the following argument:

> [The defense] never tied any of this overscheduling to any event in this case. They never said, gee, look at the date on which he signed this loan applications and at that point he was involved in this big matter with his firm or he was traveling or he wasn't concentrating. . . . [the defense did not] tie anything up. When he signed his tax returns, there's no evidence to say at the time he did that, he was in a committee hearing. At the time he did any of this stuff. At the time he filled out the tax organizers, he was too busy because he was in the middle of his big engagement for work. . . . He never ties it up—"

*Id.* (citing Tr. 1420). In the middle of the Government's argument, Thompson's counsel objected, which the Court overruled. *Id.* at 23 (citing Tr. 1420). The Court's failure to sustain the defense objection, insists Thompson, was error, as it allowed

the jury to consider the fact that Thompson did not present certain evidence when he was not required to present any evidence at all. *Id.*

In support, Thompson cites only one out-of-Circuit case, *United States v. Hernandez*, 145 F.3d 1433, 1439 (11th Cir. 1998). Mot. Post-Trial at 23. But in *Hernandez*, while the Eleventh Circuit acknowledged that "a prosecutor may not comment about the absence of witnesses or otherwise attempt to shift the burden of proof," the court ultimately rejected the defendant's burden-shifting argument. 145 F.3d at 1439. The court reasoned that "it is not improper for a prosecutor to note that the defendant has the same subpoena powers as the government, particularly when done in response to a defendant's argument about the prosecutor's failure to call a specific witness." *Id.* (internal quotation marks and citations omitted). So too here, it was not improper for the Government to argue on rebuttal that the *defense*, meaning the defense team, did not connect Thompson's business to his lack of intent to file false tax returns. Thompson's citation to *Hernandez* therefore misses the mark.

As the Government points out, it is well-established in the Seventh Circuit that, in closing arguments, "[t]he prosecution is well within its rights in pointing out the absence or weakness of defense evidence" in response to defense evidence or defendant's arguments. Resp. at 21–22 (quoting *Carswell*, 996 F.3d at 796–98, and citing, among other cases, *United States v. Castillo*, 965 F.2d 238, 244 (7th Cir. 1992) ("All the prosecutor was saying was that, with the trial complete, there was no evidence to support the defense lawyer's argument that his client had been engaged in a legitimate transaction. He was commenting on the balance of the evidence.");

*United States v. Nunez*, 532 F.3d 645, 654 (7th Cir. 2009) ("[P]rosecutor's comment was an attack on the strength (or lack thereof) of the defense—which is permissible. . . .")).

The Court finds that the Government's rebuttal arguments did not impermissibly shift the burden of proof to Thompson, especially because the jury was instructed as to the burden of proof and the Government's comments did not implicate Thompson's right not to testify.[17] Resp. at 22 (citing *United States v. Roux*, 715 F.3d 1019, 1031 (7th Cir. 2013)). At trial, not only did the Court instruct the jury both immediately before and immediately after closing arguments that the Government bears the burden of proof at all times, but the Government also began its rebuttal argument by reminding the jury that the Government had the burden of proof and that Thompson was not required to present evidence. Tr. 1318, 1409, 1421; *United States v. Chaparro*, 956 F.3d 462, 484 (7th Cir. 2020) (finding the government's argument that the defense could have subpoenaed family members was permissible, and noting with approval that the prosecutor reminded the jury that the government bore the burden of proof). The Court thus finds that the Government's statements about the lack of evidence were not improper.

### 5. Non-Relevant Evidence

Finally, Thompson contends that the Government improperly argued on rebuttal that Thompson had "injected evidence that's not relevant and arguments

---

[17]Thompson does not contend that the comments implicated his right not to testify, and the Court agrees with the Government that the comments did not implicate that right, given that the purportedly absent evidence—primarily about Thompson's busy schedule—could have come from sources other than Thompson himself. Resp. at 23.

that aren't relevant." Mot. Post-Trial at 22 (citing Tr. 1409–10, 1421). As Thompson correctly points out, the Court, not the Government, is the arbiter of what evidence is relevant. *Id.* Admittedly, it would have been better for the Government to use a word other than "relevant" to argue its point that the evidence introduced by the defense should be given no weight. *See* Resp. at 23. Still, the Court agrees with the Government that such comments were not so prejudicial as to deprive Thompson of a fair trial, given that the jury was instructed that it was their role to consider only "what the witnesses said when they were testifying under oath, the exhibits [the Court] allowed into evidence, and stipulations" and that the jury was to give that evidence "whatever weight [they] decide[d] it deserve[d]." *Id.* (citing Tr. 1318–19).

All in all, the Court finds that the Government's arguments during its closing argument and rebuttal do not warrant a new trial.

### C. Motions *in Limine* and Evidentiary Rulings

Thompson contends that the Court erred in certain evidentiary holdings, meriting a new trial. Mot. Post-Trial at 23–25. "[I]f an error in the admission or exclusion of evidence was committed during the trial, the court will grant a new trial only if the error had a substantial influence over the jury, and the result reached was inconsistent with substantial justice." *United States v. Walton*, 217 F.3d 443, 449 (7th Cir. 2000) (internal quotation marks and citations omitted). When a defendant moves for a new trial based on the exclusion of evidence, "a new trial is appropriate only if the average juror would have found the government's case significantly less

persuasive had the wrongly excluded evidence been admitted." *United States v. Brown*, 871 F.3d 532, 536 (7th Cir. 2017) (internal citation omitted).

### 1. Exclusion of Evidence of Thompson's Efforts to Repay and Repayment of Loan

Thompson argues that the Court erred in denying his Motion *in Limine* No. 11 and thereby excluding evidence of Thompson's post-March 1, 2018 efforts to repay and eventual repayment of his Washington Federal loans. Mot. Post-Trial at 24. Thompson contends that such evidence was relevant to: (1) his mental state when he made the charged false statements and (2) his "purpose" of influencing PHL and the FDIC in the collection of the loan. *Id.* In denying Thompson's Motion *in Limine*, the Court found that such evidence was not relevant. R. 95 at 3–4, 29. Thompson has not advanced additional arguments in support the relevance of the evidence; the Court finds its earlier reasoning sound, and a new trial is not warranted based on the exclusion of this evidence.

Thompson points to Hannigan's testimony at trial regarding discussions throughout 2018 regarding refinancing the Washington Federal loans. Mot. Post-Trial at 24 (citing Tr. 725–729). According to Thompson, this evidence on its own— without evidence that Thompson was cooperative with PHL in its efforts to collect the loan and that Thompson paid back the full principal balance—created the false and prejudicial impression that he did not pay back the loan. *Id.* In response, the Government correctly points out that Hannigan's testimony with which Thompson now takes issue was elicited by the defense, not the Government, over the Government's objection. Resp. at 23 (citing R. 78 at 5). Because Thompson

strategically decided to elicit this testimony, the Government argues that he has waived any argument that it was misleading to the jury. *Id.* at 23–24 (citing *United States v. Lundberg*, 990 F.3d 1087, 1094 (7th Cir. 2021)). The Court agrees. *See, e.g., United States v. Driver*, 242 F.3d 767, 770 (7th Cir. 2001) (internal citations omitted) ("If, for example, defense counsel elicits testimony at trial, the defendant can't argue on appeal that the evidence was hearsay and should have been excluded. When the court does exactly what the defendant wants, the defendant has waived rather than simply forfeited any argument that things should have been done otherwise."). Thompson has waived any argument that admission of Hannigan's testimony regarding refinancing the loan was prejudicial and warrants a new trial.

### 2. Admission of Government Exhibits Showing Loan Balance

Thompson next argues that the Court erred by admitting exhibits GX 57, GX 59–GX 61, GX 73, and GX 139 (all of which show the loan balance) on the basis that such documents were not being offered for the truth of the matter asserted but rather to show Thompson's knowledge. Mot. Post-Trial at 24–25; *see* R. 114, Exhibit Rulings. Thompson maintains that the Government did indeed offer the documents for the truth of the matter asserted—specifically the amount of the loan balance— and that the Government so argued in its closing argument. Mot. Post-Trial at 25 (citing Tr. 1338–39, 1344–45). The Court is somewhat puzzled by Thompson's argument, which appears to be two arguments rolled into one: (1) the Court erred in admitting the exhibits over Thompson's hearsay objections; and (2) the Government's

use of the exhibits for the truth of the matter asserted therein during its closing argument prejudiced Thompson.

With respect to the first argument, Thompson appears to suggest that the Court erred in finding that the exhibits were not being offered for the truth of the matter asserted but rather to show Thompson's knowledge. Mot. Post-Trial at 25. To that end, Thompson insists that the evidence was offered for the truth of the matter asserted, reasoning "[i]n particular, the government introduced the documents to show what the loan balance was and that defendant saw that information and maintained the documents in his files, and thus that he knew what the balance was when he spoke with Planet Home Lending and the FDIC years later." *Id.* However, Thompson's own argument reveals that the Court was correct, in that the exhibits were used to show that Thompson *saw the listed loan balance*, maintained that loan balance as part of his records, and *had knowledge of that loan balance* when he spoke to PHL and FDIC years later. The Court agrees with the Government, *see* Resp. at 24, that the exhibits were relevant to Thompson's knowledge, and finds that the Government was not offering them for the truth of the matter asserted. As such, the Court did not err in admitting the exhibits over Thompson's hearsay objections.[18] *See* Exhibit Rulings.

---

[18]As for GX 57 and GX 139, the Court additionally overruled Thompson's hearsay objections to those exhibits on the ground that Thompson's statements in the email chains were admissions by a party opponent under Fed. R. Evid. 801(d)(2). *See* Exhibit Rulings. Contrary to the Government's assertions, *see* Resp. at 24, the Court's Rule 801(d)(2) holdings were limited to Thompson's statements pursuant to Rule 801(d)(2)(A); the Court did not hold that there were adoptive admissions under Rule 801(d)(2)(B).

The Court turns to Thompson's second, but closely related, loan balance exhibit argument, that the Government improperly relied on the exhibits for the truth of the matter asserted during its closing argument. As an initial matter, as the Court stated in its earlier Exhibit Rulings Order, GX 57 and GX 139 are email communications that contained statements by Thompson, which are admissions by a party opponent under Fed. R. 801(d)(2). Exhibit Rulings. So, in addition to holding that GX 57 and GX 139 were not hearsay because they were not being offered for the truth of the matter asserted, the Court also found that Thompson's statements were not hearsay under Rule 801(d)(2). *Id.* As a result, Thompson's argument that the Government should not have been able to rely on the truth of the exhibits is a non-starter with respect to any of Thompson's statements in GX 57 and GX 139.

Thompson's loan exhibit argument has another fatal flaw in that he failed to object to the Government's reliance on the truth of these exhibits during the Government's closing. As stated above, in reviewing the closing argument with which Thompson takes issue, the Court agrees with the Government that the exhibits were admitted for the purpose of showing Thompson's knowledge of the loan balance. Resp. at 24; Tr. 1338–39, 1344–45. However, to the extent the Government relied on these exhibits to show the amount of the loan, Thompson failed to object. Accordingly, the Government is correct that Thompson forfeited the argument and it is subject to plain error review. Resp. at 24; *see Hicks*, 15 F.4th at 816. Applying plain error review, Thompson's argument falls flat. Because other, non-hearsay evidence was before the jury about the amount of the loan, any potential prejudice of the Government using

the subject exhibits to establish the amount of the loan was small, and certainly would not have had "substantial influence over the jury." *Walton*, 217 F.3d 443 at 449. The admission of GX 57, GX 59–GX 61, GX 73, and GX 139 and the Government's arguments about them during closing do not warrant a new trial.

### D. Jury Instruction

In cursory fashion, Thompson argues that the Court erred by failing to give Thompson's requested good faith jury instruction relating to the tax charges. Mot. Post-Trial at 25 (citing R. 135). Before trial, Thompson requested that the Court give a good faith instruction to the jury stating that, if Defendant believed in good faith that he was acting within the law, he did not make a false statement on a tax return as charged in Counts III through VII. R. 56. The Court deferred ruling until trial, and after the close of evidence, the Court declined to give Thompson's proffered good faith instruction. R. 135, Jury Instruction Order at 1–2. The Court agreed with the Government that the instruction was not mandated by *Cheek v. United States*, 498 U.S. 192, 201 (1991), and that, based on the evidence introduced at trial, Thompson's proffered good faith instruction was not warranted. *Id.* at 1. The Court instructed the jury as to the definition of willfulness. Tr. 1327:8–22 (instructing jury that to find Thompson guilty of Counts III through VII, the jury must find that Thompson acted willfully, meaning that "he knew he had a legal duty to file a truthful tax return, but when he signed the return, he did not believe it was truthful as to a material matter").

The Seventh Circuit has held that the good faith instruction is not required when the jury is instructed on willfulness and evidence did not support the

62

instruction. Resp. at 25 (citing *United States v. Kokenis*, 662 F.3d 919, 929–30 (7th Cir. 2011) (willfulness instruction "necessarily encompassed the defense theory of good faith" as the "jury could not find *both* that [defendant] acted willfully as defined in the instructions *and* that he acted in good faith") (emphasis in original)). As the Court stated in its previous Order, no evidence was presented that Thompson did not know the law or that he misunderstood the law. Jury Instruction Order at 1–2. As a result, the Court finds that a new trial is not warranted based on the Court's refusal to give Thompson's proffered good faith instruction.

## Conclusion

For the reasons given above, the Court denies Thompson's motion for judgment of acquittal and for a new trial [154].

Dated: June 3, 2022

United States District Judge
Franklin U. Valderrama

63